IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ROBERTA WILLIAMS,                          Civ. No. 04-6258-HO

            Plaintiff,              ORDER

      v.

MARY-LYNN YEAGER and MARK G.
REINECKE,

            Defendants.


     The parties agree that the amended complaint alleges
wrongful use of civil proceedings against defendants.  Defendants
each filed a motion for summary judgment, arguing that plaintiff
cannot establish that defendants filed civil proceedings against
plaintiff without probable cause or for an improper purpose, as
required to prevail on a claim for wrongful initiation.
Defendant Yeager's motion is denied based on the existence of
disputed issues of material fact.  Defendant Reinecke's motion is
granted because there is no evidence from which a juror could
infer that he acted with malice.

///

<u>Undisputed Facts</u>

Except where noted, the following facts are undisputed. Plaintiff Roberta Williams is the common law wife of Mark Garner. The couple lives in British Columbia, and has lived together for over 25 years.  Mark Garner's father, Lloyd Garner, moved in with the couple in 1995.  After Lloyd Garner died, his daughter, defendant Mary Lynn Yeager, served as the personal representative of his estate.

Defendant Reinecke, an attorney, represented Yeager in her capacity as personal representative in Deschutes County Circuit Court case <u>Yeager v. Garner</u>, 01-cv-474AB (the underlying action), filed October 2, 2001.  The complaint in that case alleges elder abuse, money had and received, and conversion against plaintiff and Mark Garner.

Before defendants filed the underlying action, Reinecke possessed affidavits from Lloyd Garner's ex-wife, Mary Grace Langston Smith, and from Lloyd Garner's children, Bradley Alexander George Garner, Richard Lloyd Garner and Yeager.

Bradley Garner attested, <u>inter alia</u>, that plaintiff's bank account at Bank of the Cascades, Sunriver, Oregon, held a deposit dated May 21, 2001 of proceeds from a hospital bond owned by Lloyd Garner.  Reinecke Aff., ex. C at 4.  Bradley Garner's affidavit further provides,

> Sometime after our [1990] wedding I recall Roberta mentioning to us that Lloyd was sending them cash in

2 - ORDER

the mail almost weekly with a note inside stating House
fund.  She told me that they were stashing this money
all over the inside of their home.
* * *
Sometime after Lloyd had moved in with Mark and Roberta
both Mark and Roberta would tell us all the time that
Lloyd had no money and that all of us were going to
have to help pay for his care.  This was after Mark had
already added on the 2000 square foot addition to his
house.
* * *
Mark and Roberta had left Lloyd to use the public
transit as his way of entertaining himself during the
day while they were at work in which numerous times he
had to be brought home by the police as he had stayed
on the bus to the end of it's route . . .  It ended up
where they were locking him in the unfinished basement
of their house with a bed, small refrigerator, and a
bunch of stored items, on a concrete floor, while they
went to work. . .  Roberta was extremely short fused
with Lloyd all the time at this point. . .  She would
treat him as if he was a misbehaven child and would
raise her voice at him all the time.
* * *
As far back as I can remember both Mark and Roberta had
outstanding balances on their credit cards.  As soon as
Lloyd moved in with them all of these accounts were
totally paid in full.
At the same time a number of big ticket items were
purchased IE: new vehicle, $5000.00 Macintosh lap top
computer, video surveillance camera system, video
cameras, large screen projector, complete master
bedroom suite, Nautilus workout gym, 2 new televisions,
stereo surround a sound system, Condo in Oregon along
with all the furniture to furnish the condo.  $2000.00
Murphy bed, TV console, television, stereo, couch
sectional, coffee & end tables as well a misc. items.
* * *
There is no hiding that Mark and Roberta's lifestyle
changed dramatically after Lloyd moved in with them and
it is all too apparent how this lifestyle change came
about. . .
* * *
[Mark Garner's] net family income for the year 2000 was
only $22,374.00 Canadian . . .  It  just doesn't add
up.  This is why we feel the funds have been
misappropriated.
* * *

On [August 31, 2001 or September 1, 2001], Mark became
aware that his brother Rick had taken Lloyd's Mustang
vehicle to California. . .  On the key ring . . . is a
safety deposit key. . .  [A]s soon as Mark found out
about Rick's whereabout's (he is temporarily staying at
Mary-Lynn's) [in Oregon]), Mark and Roberta made a last
minute trip to Oregon to the condo obviously to do some
"banking[.]"

Reinecke Aff., ex. C.

Mary Grace Langston Smith attested, <u>inter alia</u>, that Lloyd
Garner told her on several occasions that Mark was stealing all
his money.  Reinecke Aff., ex. B.

Yeager attested, <u>inter alia</u>, that she believes plaintiff's
account at the Bank of Cascades contains money from Lloyd
Garner's estate, and Mark Garner has or had a safety deposit box
at that bank.  Reinecke Aff., ex. E.

Bradley Garner learned of Mark Garner's income from rifling
through papers while staying in the home shared by plaintiff and
Mark Garner.

Plaintiff works as a manger for CADD Solutions, and has
worked for CADD Solutions since 1989.  Mark Garner also works for
CADD solutions.  Mark Garner's net family income for 2000 was
$22,374 Canadian.  From 1995 through 2005, Mark Garner made
approximately $15,000-$20,000 per year as salary from CADD, plus
a few hundred dollars from construction jobs.

The court in the underlying case entered a stipulated order
freezing assets titled in the name of Lloyd Garner or titled
jointly in the names of Lloyd Garner and Mark Garner.

4 - ORDER

Plaintiff did not file a dispositive motion seeking dismissal in the underlying action.

In the underlying action, the jury returned a verdict in favor of plaintiff and against Mark Garner.  The jury awarded $250,000 in damages.  The court reduced the award to $200,000, the amount of the prayer.

### Plaintiff's Additional Facts

Plaintiff presents the following additional facts.

Plaintiff is not married to Mark Garner.  Plaintiff has never lived or owned property in the United States.  Reinecke knew that plaintiff's name does not appear on the title of the Vancouver, British Columbia home where plaintiff lives with Mark Garner.

Plaintiff and Mark Garner maintain separate bank accounts.

Plaintiff had no knowledge of Lloyd Garner's finances. Plaintiff was not involved in handling his finances.

Plaintiff opened a bank account at the Bank of Cascades with an initial deposit of $1,0000.  No subsequent deposits were made to the account.  Bradley Garner's statement that $7,812.50 in proceeds from Lloyd Garner's hospital bonds were deposited in plaintiff's bank account is false.

In 1995, Mark Garner obtained a $125,000 loan secured by a mortgage on the house.  Mark Garner used the loan to remodel the house, and to buy furniture and equipment for his business.

Plaintiff and Mark Garner initially employed Gordon Phillips as their attorney in the underlying action. Phillips quit in October 2002, after which time plaintiff and Garner represented themselves.

During the discovery phase of the underlying action, plaintiff provided defendants with complete copies of her Oregon bank account from the date it was opened until March 2003. Defendants continued to press claims against plaintiff after learning that proceeds from Lloyd Garner's hospital bonds were not deposited in plaintiff's bank account. Defendants produced no evidence in the underlying case of wrongdoing by plaintiff.

In his opening statement and closing argument in the underlying case, Reinecke made no statements concerning wrong-doing by plaintiff.

<u>Discussion</u>

Summary judgment is appropriate if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

The elements of the tort of wrongful use of civil proceedings are (1) commencement and prosecution by a defendant of a judicial proceeding against the plaintiff, (2) termination of the proceeding in favor of the plaintiff, (3) absence of probable cause to prosecute the proceeding, (4) the existence of malice, or as is sometimes stated, the existence of a primary

6 - ORDER

purpose other than that of securing an adjudication of the claim, and (5) damages.  Roop v. Parker Northwest Paving Co., 94 P.3d 885, 896 (Or. App. 2004).

Defendants argue that a reasonable juror could not infer they lacked probable cause, and there is no evidence they prosecuted the underlying action with an improper purpose. Plaintiff contends that Reinecke prosecuted claims against her in order to obtain discovery, and to frighten her and cause her emotional distress and expense.[1]

Probable cause in this context means an objectively reasonable belief that a claim had a good chance of succeeding, and that the belief or objective reasonableness of the belief was not lost during the pendency of the litigation.  Id. at 896-97.

_____

[1]As noted, the complaint in the underlying action alleged elder abuse, money had and received, and conversion.  Elder abuse consists of a wrongful taking or appropriation of money or property that belongs to an elderly or incapacitated person. Church v. Woods, 77 P.3d 1150, 1153 (Or. App. 2003).
> In the action for money had and received, it is sufficient to show that, by any process which was treated by the parties as a money transaction, the defendant has received money, or its equivalent, which in equity and in good conscience belongs to and should be paid to the plaintiff, and this is true although the plaintiff may never have had actual manual custody of the specie in question.

Service Lumber Co. v. Sumpter Val. Ry. Co., 67 Or. 63, 77, 135 P. 539 (1913), judgment set aside on other grounds, 81 Or. 32, 158 P. 175 (1916).  "[C]onversion is the intentional exercise of control over a chattel belonging to another that is so serious an interference with the other's right to control the chattel that the actor must be required to pay the other the full value of the chattel." Bergeron v. Aero Sales, Inc., 134 P.3d 964, 967 (Or. App. 2006).

7 - ORDER

When a defendant is an attorney, lack of probable cause alone cannot support a legally sufficient inference that the attorney acted with an improper purpose.  There must be independent evidence substantiating that the attorney prosecuted or continued to prosecute claims primarily for a reason other than to obtain adjudication of the claims for his client.  <u>Bachmeier v. Tuttle</u>, 96 P.3d 871, 876 (Or. App. 2004).

Plaintiff points to the bank records produced in the underlying case, which fail to evince the alleged deposit of proceeds of Lloyd Garner's hospital bonds into plaintiff's Oregon bank account.  The records evince specific facts permitting an inference of fabrication.  <u>See</u> <u>Blandino v. Fischel</u>, 39 P.3d 258, 262 (Or. App. 2002).  Thus, whether defendants had probable cause to prosecute their claims against plaintiff after receiving the bank records is a question for the jury.  <u>Id</u>.

A jury may infer malice or improper purpose in most wrongful initiation cases where it is found that the defendant lacked probable cause.  <u>Alvarez v. Retail Credit Ass'n of Portland, Or., Inc.</u>, 381 P.2d 499, 504 (Or. 1963).  As noted, however, independent evidence of malice is required to proceed against an attorney defendant such as Reinecke.  <u>Bachmeier</u>, 96 P.3d 876.  Plaintiff points to no such evidence.  Reinecke is entitled to

///

8 - ORDER

summary judgment.  Plaintiff may go forward against defendant
Yeager.

Conclusion

Based on the foregoing, defendant Reinecke's motion for
summary judgment [#30] is granted; defendant Yeager's motion for
summary judgment [#42] is denied.

IT IS SO ORDERED.

DATED this   17th   day of January, 2007.

                                    s/ Michael R. Hogan
                            United States District Judge

9 - ORDER